UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| DONALD FOSTER,<br><br>            Plaintiff,<br><br><br>    vs.<br><br>NEW ANGUS LLC d/b/a DEMKOTA RANCH BEEF,<br><br>        Defendant. | 1:23-cv-1020<br><br><br>**COMPLAINT**<br>**WITH JURY TRIAL DEMANDED** |

COMES NOW Plaintiff Donald Foster, and for his Complaint for age discrimination and retaliation in employment against New Angus LLC d/b/a DemKota Ranch Beef, states and alleges as follows:

## JURISDICTION AND VENUE

1)  This employment discrimination and retaliation action arises under the Age Discrimination in Employment Act of 1967, as amended, codified at 29 U.S.C. § 621, *et seq.* ("the ADEA").

2)  Plaintiff, Donald Foster, "Foster" is s resident of Brown County, South Dakota.

3)  At all times relevant to this Complaint, Plaintiff was over 40 years of age and had protected employment status under the provisions of the ADEA.

4)  Defendant New Angus LLC does business under the name DemKota Ranch Beef ("DemKota"), and owns and operates a beef processing and packaging business that

is headquartered in Aberdeen, South Dakota.

5)    DemKota is an "employer" within the meaning of the ADEA at 29 U.S.C. § 630(b).

6)    This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331 and § 1343(a)(3).

7)    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to this action occurred within the Northern Division of the United States District Court for the District of South Dakota.

8)    Plaintiff timely filed a Charge of Discrimination alleging age discrimination and retaliation with the EEOC prior to instituting this action.

9)    Plaintiff requested and received a Notice of Right to Sue dated October 26, 2023.

## FACTUAL ALLEGATIONS

*The Best Partner You'll Ever Have*

*You've Got Our Word On That*

*We're rooted in DemKota Country, its community, traditions, and attitudes.  We're ranchers and beef lovers.  And we're people of our word.*

**-DemKota motto**

10) DemKota is a beef processing and packaging operation that employs approximately 800 people in Aberdeen, South Dakota.

11)  DemKota's all male management team represents to its employees that it is committed to a discrimination free workplace and to providing equal employment opportunities in all aspects of employment.

12)    DemKota's written employment policies express prohibit age discrimination in employment, as follows:

> DemKota Ranch Beef is committed to providing equal employment opportunity (EEO) to all applicants and team members without regard to race, color, religion, creed, sex, sexual orientation, gender identity or expression, age, marital status, national origin, disability, genetic information (including but not limited to family medical history), veteran status, or any other protected classification under applicable law....
>
> This policy relates to every aspect of employment including recruitment, testing, selection, compensation, benefits, training and development, promotion, transfer, termination, and all other privileges, terms and conditions of employment.

13) DemKota written employment policies also expressly prohibit harassment based upon age.

14) DemKota's written employment policies state that it will accept and investigate all reported complaints of discrimination or harassment, as follows:

> Team members who believe they have been unlawfully discriminated against should discuss their concerns with their manager, or, if that is not appropriate, contact their Human Resources representative. In all cases where a manager or another member of management is notified first, Human Resources should be notified immediately. Human Resources will accept, investigate and attempt to resolve all internal team member or candidate complaints.

15) DemKota's written employment policies state that all employees and managers must report any incidents of unlawful discrimination or harassment to Human Resources.

16) DemKota's written employment policies state that a manager who fails to report suspected a violation of the discrimination or harassment policies "will be held accountable" for their inaction.

17) DemKota's written employment policies require its Human Resources Department to conduct a prompt investigation of the allegations to obtain the facts from any and all parties or witnesses, and to take appropriate actions to remedy a situation where the facts support the

allegations of discrimination or harassment.

18)  DemKota's written employment policies state that it prohibits retaliation against anyone who reports a complaint of discriminatory treatment, as follows:

> DemKota Ranch Beef will take appropriate action to ensure that the rights of individuals to file complaints (whether through the internal process or with a federal, state, or local agency) will be respected and not interfered with in any manner.  Further, the Company will not retaliate against any individual who either raises concerns of a violation of this EEO policy, or who participates in the investigation of such concerns.

19)  DemKota's written employment policies state that it prohibits retaliation in another of its employee policies, as follows:  "We prohibit retaliation of any sort against a person because that person reported a concern, brought a complaint, cooperated in an investigation or a complaint, or because a person is closely associated with an individual who has raised a complaint."

20)   One department in DemKota's plant is its Wastewater Treatment Department, commonly referred to as "the Lab."

21)    DemKota's wastewater department is generally staffed by one laboratory technician ("lab tech"), and up to eleven (11) wastewater process monitors ("operators"), and one byproducts monitors  ("hide hanger").

22)  The lab tech position generally works from Monday through Friday, with some weekend work on an as-needed basis.

23) The lab tech position requires the use of lab equipment and chemicals used in the analysis of water and wastewater. DemKota defines the key job duties of the position to include performing detailed laboratory analysis of the water and wastewater samples from the plants, including process control tests and quality control tests; collecting water and wastewater samples; accurately completing and maintaining a variety of reports required for

the legal operation of the laboratory; maintaining a quality assurance program as set by the department's supervisor; and accurately communicating the outcome of the testing to the department's supervisor.

24) According to DemKota's written job description, its lab tech position requires a technical school or 4-year college graduation with a degree in chemistry, biology, environmental science, and water or sewer plant operations, plus a Class I Operator Certification and a valid South Dakota driver's license.

25) During Foster's employment, the job duties of the DemKota products monitor primarily consisted of operating and maintaining the plant's readings on wastewater treatment equipment; inspecting, recording, and monitoring the equipment and control panels; and collecting and testing water and wastewater samples from various locations in the plant as directed.

26) DemKota's qualifications for the operator job did not require a high school diploma or any other certification.

27) The job duties of the DemKota hide hanger primarily consisted of recording and monitoring the quantity and type of hides in the vats; shoveling ice into vats; moving vats by forklift, pallet jack or hand; and hanging hides on a chain.

28) The qualifications for the byproducts monitor job required a high school graduation or GED, and the ability to operate a forklift and pallet jack.

29) During all times relevant, the DemKota lab was overseen by the Wastewater Supervisor, who reported to the Wastewater Manager. The Wastewater Manager then reported to DemKota's Vice President of Operations, Duane Clark ("Clark").

30) DemKota hired Foster as a lab tech in 2015.

31)  At the time of his demotion and termination in 2023, Foster was 68 years old.

32)  At the time of his demotion and termination in 2023, Foster was one of the oldest employees at DemKota.

33)  Foster meets the qualifications for the lab tech position because he has earned a Bachelor of Science in Biology and Bachelor of Science in Medical Technology from Northern State University, and he has also presented research articles at medical publication annual meetings related to the antiviral efficacy of new drug regimens.

34)  Foster was one of DemKota's first hires.

35)  Because Foster was the only person in the plant with the necessary certification for wastewater management, Foster's original wastewater supervisor and managers relied upon Foster's expertise and education, instructed Foster to develop processes and procedures for the Lab, and assigned Foster to oversee many of the day-to-day operations of the Lab.

36)  In early 2022, DemKota replaced both its Wastewater supervisor and its Wastewater manager.

37)  Both of Foster's new managers were approximately twenty (20) years younger than Foster.

38)  DemKota management had not given Foster a written evaluation of his performance since early in his career at DemKota.

39)  During his employment, DemKota represented to Foster that he was performing to its expectations.

40)  During his employment, DemKota repeatedly acknowledged Foster for his performance and loyalty to the company, including by giving him several bonuses.

6

41)  During his employment, DemKota never gave Foster a negative written performance evaluation.

42)  During his employment, DemKota never gave Foster a written or oral disciplinary action.

43)  During his employment, DemKota never gave Foster a written performance improvement plan.

44)  DemKota awarded Foster a commendation and a financial bonus for his performance 2022 and in his final paycheck in March 2023.

45)  In the Spring of 2022, the new Wastewater Manager Scott Langner ("Langner") told people that he had heard from third parties that Foster may be considering retirement.

46)  After Langner was hired as the Wastewater Manager, Foster began to receive congratulations from his co-workers on his upcoming retirement.  Foster informed his co-workers that he had no plans to retire.

47)  Langner did not ask Foster about his retirement plans, but considered that Foster was retirement age.

48)  Langner and the new Wastewater Supervisor Mark Gerwer ("Gerwer") relied upon the rumor about Foster's retirement as a reason to hire a new lab technician.

49)  In July 2022, Langer and Gerwer selected Dana W. as the new lab technician.

50)  Dana W. is approximately 35 years younger than Foster.

51)  Dana W. told Foster that she did not have a college degree and that she did not have or maintain a Class 1 Operator Certification as required by DemKota's qualifications for the lab tech position.

52)  Between July 2022 and February 2023, Foster's manager assigned Foster to

train Dana W. on how to perform Foster's job duties.

53)    In the course of training Dana W., Dana W. told Foster that DemKota was paying her the same pay as Foster, despite the fact that Foster was more qualified and experienced for the lab tech position.

54)    On or about Friday, February 1, 2023, Gerwer called Foster into a meeting and presented Foster with the following new job duties and work schedule:

Starting next week 1/30/2023

- Dana will be doing all the lab work. Don will fill for Dana when she is on vacation
- Don will be responsible for keeping the plant clean and washing empty tote.
- Don will be assisting with any projects as management sees fit.
- Starting 2/13/2023 Dons new schedule will be Tuesday-Saturday 0600-1430 with a 30-minute lunch.
- On Saturday, Don will be performing lab duties.
- Don will review facility in order to offer suggestions to improve processes.

55)    Gerwer told Foster that Foster would keep his same wage, and would be primarily cleaning and washing totes when Dana W. was present in the lab to do the lab tech job.

56)    On February 3, 2023, Foster went to DemKota's Human Resource Manager Kelly Comstock ("Comstock") and complained that he was being discriminated against because of his age and the perception that he was past retirement age.

57)    Foster specifically complained to Comstock that Foster believed he was being singled out, subject to worse terms and conditions of employment than Dana W., and that he had been demoted in violation of the federal age discrimination statute.

58)    At the February 3 meeting, Foster presented Comstock with the written document that Gerwer had given him at the February 1 meeting. Foster asked Comstock if she was aware of or had seen it before. Comstock replied, "No."

59) At the February 3 meeting, Comstock confirmed that Gerwer had not informed her that Foster had complained to him about age discrimination on February 1.

60) Comstock did not ask Foster to make a written or oral statement regarding his discrimination complaints.

61) Comstock confirmed to Foster that there had been no documented complaints about his performance before February 3, 2023.

62) Comstock cut her meeting with Foster short in order to take a cell phone call and did not follow up with Foster about his age discrimination complaint until Foster contacted her about the status of his complaint approximately one (1) month later.

63) Later on February 3, 2023, Gerwer met with Foster and told Foster that Foster's job assignment for the day was to clean totes and check to see if a piece equipment had been fixed.

64) At this February 3, 2023 meeting, Foster told Gerwer that he thought that he was being discriminated against because of his age, and that Dana W. was receiving better terms and conditions than he was.

65) Specifically, Foster complained to Gerwer that he believed it was unfair that Dana W. was given the all the lab work, that Foster would only be filling in as the lab tech while she was on vacation, that Foster was being assigned to do essentially do janitorial duties, and that Dana W. was being given a more preferable work schedule while Foster was assigned to work every weekend.

66) In response to Foster's complaints about Langner's scheduling and work assignment being unfair, Gerwer responded: "There is a lot around this thing that I think is hokey."

67)    At this meeting, Foster advised Gerwer that Foster would do the assigned tasks despite his complaints because Foster did not want to lose his job.

68)    At this meeting, Foster asked Gerwer if Gerwer was aware that Foster had initiated an age discrimination complaint with DemKota's Human Resources Department.

69)    Gerwer denied having heard anything about Foster's age discrimination complaint to the Human Resources Department.

70)    After Foster's age discrimination complaints on February 1, 2023 and February 3, 2023,  Langner and Gerwer began to try to create documentation in Foster's personnel file via making notes about Foster's alleged performance issues and failures.

71)    On February 8, 2023, Langner approached Foster to explain why Foster's job duties had been changed. During this meeting, Langner first told Foster that Langner felt that Foster had "pushed back" on changes that Langner wanted to make in the Lab, and Langner said that it was "absolutely a problem for him that Foster made handwritten notes of his recording data before entering the data onto Lab forms."

72)    Langner was either unaware or did not care that Dana W. and other younger operators were all using handwritten notes of their recording data before transcribing the data onto Lab forms, in the same way that Foster did.

73)    At the February 8, 2023 meeting, Langner told Foster that "[b]ecause we are such a young staff, [Foster] would be spending time with the new operators training them" instead of doing the analytical job duties of the lab tech position.

74)    Langner did not ask about or mention Foster's age discrimination complaint during their meeting.

75)    At some point during the February 8, 2023, meeting, Gerwer had entered, and

Gerwer stayed with Foster after Langner walked away.

76)  Once Langner left the meeting, Foster asked Gerwer what the purpose of the meeting had been, and Gerwer stated that he thought that Langner had been trying to "smooth things over."

77)  On February 9, 2023, Gerwer approached Foster and asked if Foster intended to keep his wastewater certification from the State of South Dakota.

78)  Since the certification was supposed to be a requirement for the lab tech position, Foster interpreted the comment as a further indication that Gerwer was trying to force him out of the lab tech position.

79)  Foster responded that he did not know that the certification was necessary for Foster's new job assignments.

80)  Gerwer then asked Foster:  "Are you going to retire soon or are we going to have to drag you out of here?"

81)  Foster told Gerwer that Foster did not plan to retire for at least another year and a half because of his family's retirement plans.

82)  On March 4, 2023, because Foster had not had any contact from anyone at DemKota about his age discrimination complaints, Foster sent Comstock an email asking about the status of his February 1 and February 3 age discrimination complaints, and reasserted that he believed that he was discriminated and harassed because of his age. Foster reminded Comstock that the DemKota handbook stated that his complaint was required to be investigated.

83)  At the end of the business day on March 10, 2023, Comstock responded to Foster's March 4 email, via an email, and informed Foster that Langner's conversation with

him on February 8 "was the result of the investigation as I asked him to meet with you directly to explain why the changes were made."

84) Comstock's email stated that Langner thought that Foster's "experience would be best utilized in providing coach/assistance to much less experienced operators who are currently on the floor versus directly in the lab."

85) Comstock's email further related that Langner had shared concerns about Foster's performance during her "investigation."

86) Comstock email concluded that "I found no evidence of discrimination in the re-allocations of your job duties that was done last month. You state that you were given a demotion in your letter below, but you were not.  Your wage remained intact, only specific duties were re-allocated."

87) On March 11, 2023, hopeless that he would not be further targeted for discrimination and harassment, Foster was constructively discharged from employment.

## CAUSES OF ACTION

### COUNT ONE
### Age Discrimination in violation of the ADEA

88) Plaintiff incorporates the foregoing paragraphs by reference.

89) The ADEA at 29 U.S.C. § 623(a) provides in relevant part that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to her compensation, conditions, or privileges of employment, because of such individual's age" or "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age."

90) Defendant treated younger employees more favorably than Plaintiff in the terms and conditions of employment.

91) Defendant knew that Plaintiff was in the protected age category.

92) At all times relevant to this Complaint, Plaintiff was qualified for his position as indicated by the fact that Defendant assigned and continued to tell Plaintiff that he was going to be training younger employees.

93) Defendant removed Plaintiff from his position as lab tech and replaced him with a substantially younger employee.

94) Defendant demoted Plaintiff from his position as the lab tech into a job position that offered less responsibility, less career opportunities, and increased physical labor, in order to benefit at least one younger employee.

95) Defendant terminated Plaintiff by a constructive discharge on March 11, 2023, in retaliation for Plaintiff's ongoing opposition to discrimination.

96) Defendant would not have subjected Plaintiff to demotion but for his age.

97) Defendant would not have subjected Plaintiff to removal from his lab tech position but for his age.

98) Defendant would not have treated younger employees more favorably than Plaintiff in the terms and conditions of employment but for its bias and stereotypes about Plaintiff's age.

99) Defendant would not have constructively discharged Plaintiff from employment but for its bias and stereotypes about Plaintiff's age.

100) Defendant's proffered reason for its adverse employment actions against the Plaintiff is not the real reason for its actions, and is pretext to hide age discrimination.

101) Plaintiff was constructively discharged from his employment.

102)  As a direct and proximate result of Defendant's discriminatory treatment of Plaintiff because of his age, Plaintiff suffered a loss of wages, employment-related benefits, career opportunities and vocational losses, and will continue to suffer a loss of future wages, employment-related benefits, career opportunities and vocational losses.

103)  Defendant's violations of the ADEA via its adverse employment actions against Plaintiff were willful.

**COUNT TWO**
**Retaliation for engaging in protected activity in violation of the ADEA**

104)  Plaintiff incorporates the paragraphs above by reference.

105)  The ADEA at 29 U.S.C. § 623(d) provides in relevant part that: "[i]t shall be unlawful for an employer to discriminate against any of [its] employees… because such individual … has opposed any practice made unlawful by this section.…"

106)  Plaintiff opposed discrimination on February 1, 2023 when he complained to his supervisor that he was being demoted and subject to different terms and conditions of employment than a similarly situated younger employee.

107)  Plaintiff opposed discrimination on February 3, 2023 when he complained to DemKota's Human Resources Manager and his supervisor that he was being demoted and subject to different terms and conditions of employment than a similarly situated younger employee.

108)  Plaintiff opposed discrimination on February 9, 2023 when he complained to his supervisor that he was being demoted and subject to different terms and conditions of employment than a similarly situated younger employee.

109)  Plaintiff opposed discrimination on March 4, 2023 when he complained to

DemKota's Human Resources manager that the company had failed to respond to his age discrimination complaints.

110)  Defendant failed to investigate Plaintiff's age-based discrimination and harassment complaints as required by its policies and procedures.

111)  Defendant failed to take remedial action in regard to Plaintiff's age-based discrimination and harassment complaints as required by its policies and procedures.

112)  After Plaintiff began to oppose discrimination on February 1, 2023, Defendant's supervisor and manager began to create documentation in Foster's personnel file about negative performance allegations, and they assigned him to demeaning and demanding physical tasks.

113)  After Plaintiff began to oppose discrimination on February 1, 2023, Defendant's supervisor indicated that Plaintiff was going to continue to receive physically demanding, demeaning job assignments unless Plaintiff retired.

114)  Defendant terminated Plaintiff by a constructive discharge on March 11, 2023,  in retaliation for Plaintiff's ongoing opposition to discrimination

115)  As a direct and proximate result of Defendant's retaliation in response to Plaintiff's opposition to age discrimination, Plaintiff suffered a loss of wages, employment-related benefits, career opportunities and vocational losses, and will continue to suffer a loss of future wages, employment-related benefits, career opportunities and vocational losses.

116)  Defendant's violations of the ADEA via its retaliatory conduct against Plaintiff were willful.

## **REQUESTS FOR RELIEF**

Plaintiff Donald Foster requests a judgment against the above-named Defendant as follows:

A.  For all damages allowable under the ADEA, including monetary damages sufficient to compensate Plaintiff for all his special and general damages;

B.  For liquidated damages arising from his ADEA claims, as allowed by the Court;

C.  For Plaintiff's reasonable attorney fees, costs, disbursements, and expenses, as allowed by the Court;

D.  For a trial by jury on the issues in this matter, as allowed by the Court; and

E.  For such other and further equitable relief as the Court may deem just and appropriate.


Dated this 21st day of December 2023.

> **JOHNSON POCHOP & BARTLING LAW OFFICE LLP**
>
> Stephanie Pochop
> 405 Main Street | PO Box 149
> Gregory, SD 57533
> (605) 835-8391
> Stephanie@Rosebudlawyers.com
>
> *AND*
>
> Gavin Pochop
> 315 S. Phillips Ave.| PO Box
> Sioux Falls, SD 57104
> (605) 835-8391
> Gavin@Rosebudlawyers.com
>
> *Attorneys for Plaintiff Donald Foster*

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Donald Foster

**DEFENDANTS**

New Angus LLC d/b/a Demkota Ranch Beef,

(b) County of Residence of First Listed Plaintiff ___Brown County, SD___
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant ___Brown County, SD___
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Stephanie E. Pochop | Johnson Pochop & Bartling
405 Main Street |PO Box 149 Gregory, SD 57533 (605) 835-8391

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                              *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☒ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Age Discrimination in Employment Act of 1967, as amended, codified at 29 USC § 621 et seq. (the ADEA)

Brief description of cause:
Employment discrimination and retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$75,000+

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE   1/21/23

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____